is now in session. Please be seated. Good morning and welcome. Thank you so much for coming. And we would also, Judge Bay and I, would like to thank our Oregon hosts here at Pioneer for being so welcoming. Thank you very much. So we have a number of matters that have been submitted on the briefs. They are United States v. Hamburg, United States v. Larkins, Samuel v. Carlin, and United States v. Ruddvelt. So that leaves two cases for argument today, and our first one is United States v. Sanchez. So if counsel would please come forward. Good morning. May it please the Court, I am Thad Blank representing Andres Sanchez. I'm going to try to reserve two minutes for rebuttal. Okay, go ahead please. The government's case here was that Mr. Sanchez, a person of Hispanic descent who speaks Spanish, helped other Hispanic individuals submit tax returns that falsely or fraudulently claimed deductions to which they were not entitled. In the midst of jury deliberations over those charges, one juror May I ask you a question since we only have 10 minutes?  I want to hop in. Sorry to interrupt you. Would it be different if the district court, in excusing Juror 5, had called in the alternate juror to take that juror's place and asked the jury to completely disregard all the deliberations they had done thus far and just start anew? Absolutely. Do you think there would be no problem if that had taken place? I think that our position is that that would have remedied the involvement of Juror 5 in the deliberation in this case and that that's Moved? Sorry? Did you so move? Well, the posture was that defense counsel moved for a mistrial. Yes, moved. Slow down. Maybe we don't have to go that far. There's other alternatives available. The government suggested some of those. The district court adopted some of those. But defense counsel's position throughout was that the presence of that juror required a mistrial. Can I ask you another question then? Understanding that that would have been the best course. In this case, the court, though, was allowed to go forward with 11 instead of 12, right? The law allows the judge to go forward with 11. And if we interpret this statement that the judge made after dismissing Juror 5 after a day-long in-camera interview of each of the 12 jurors, excuse them, they leave. It's pretty dramatic when you excuse a juror. And then the judge says, well, now it's up to you to decide. Would you have reached the same verdict without Juror 5? Would you reach the same verdict with Juror 5? How is that different than the first scenario that I just asked you about? Well, it's dramatically different because in the first scenario, the jury is instructed to disregard all of the work they've done to get to that point that involves the participation of Juror 5 for at least five hours of deliberation. And in the second scenario, they're asked, do you want to change the verdict that you've already reached? Do you want to do more work? And just pragmatically speaking, you can see here that, I mean, it's 13 minutes door-to-door. They leave Judge Windmill's courtroom, go to the jury room, they're back with the verdict that they've previously reached. But if someone asked, would you reach the same verdict disregarding the excused jurors' contributions, why isn't that something that an individual could decide in 13 minutes? Well, I think they could decide that in 13 minutes because it doesn't require them to revisit the evidence. It just requires them to make a quick assessment. Does anybody want to change their vote given the limited information that we have? You know, we have no new information. We haven't been told to do anything except see if we want to change our vote. Nobody wants to change their vote, but they're not directed to revisit the evidence, the law, the process of deliberation that led to that verdict. And that's significant, and that's something that this, you know, that's why that's required when an alternate juror comes in under the rule, is because it's supposed to be a new process where all of the evidence is reconsidered. And that whole process is, the idea is, and in this case... So the error here is that the district court's instruction after dismissing Juror 5 was inadequate. Well, the error is that there was, the misconduct is that there was a juror who had really odious racial views that participated significantly in the deliberation that led to the verdict. And one of the ways, I guess we'll concede that one of the ways this could have been addressed was through more fulsome corrective measures by the district court, and that one would have corrected it, we'll concede. A mistrial would have also corrected it. Okay, but what if the, would you agree then that not substituting in the alternate juror for Juror 5, but saying start anew, you know, set aside your previous set of deliberations with Juror 5, start anew, even if you only have 11 jurors, that that would have remedied the harm? Yes, we would agree that that would be sufficient to remedy Juror 5's involvement in this process of deliberation, because the presumption is that the jury is going to follow those instructions, they're going to revisit the evidence, and the influence of Juror 5, which they may well not have perceived, should be worked out when they're talking through the evidence without that juror's perspective and his probably both overt and implicit racist perspective. I guess I'll make a couple more points. I've argued in the briefs for a heightened standard of review, of harmlessness review, and I want to make two points. I've argued, you know, the thing about this case is had the trial judge accepted the verdict and then done this voir dire, it's clear that a new trial would be required, because this Court says that the presence of one biased juror is structural error if they participate in the verdict. The fact that this biased juror participated up to the point that the jury was ready to return a verdict makes this case fall under the ambit of this rule. But even if the Court doesn't buy that, that concern underscores the prejudice that exists here, because the idea, the reason that this Court has said that the presence of a biased juror is structural error is because it tilts the whole framework for deliberation, and it's very difficult to unwind the way in which that influences all of the decisions that are made, just like a biased judge. So that underscores the significance and the prejudice of a biased juror participating in deliberations to this extent. The biased juror was brought to the judge's attention by another juror, right? He was. Yes, he was. The other point that I'd make on that is we've argued that this is akin, that in the minimum, the reasons for the Rimmer standard about a particular species of juror's misconduct should also pertain in this situation, because there's unique historical, institutional, and constitutional concerns that pertain to racism, at least to the same degree. Can I ask you another question? I'm sorry to interrupt you again. Why should the fact that no verdict taken be effectively meaningless here? Isn't there some consideration that has to be given to the fact that the district court didn't accept the verdict and did give, albeit perhaps an inadequate instruction, but did give an instruction saying, I've dismissed this juror. It's up to you to decide, would you have reached the same verdict? Did you reach the same verdict with this juror now gone? It's formulaically or sort of formally different in that the district judge just didn't take the verdict, but our position is that it's sort of a distinction without much of a difference. When that juror has participated for five hours to the point where the jury is going to return a verdict, there's not, I think you can say that there's not meaningful deliberation after that point, given the short term. They're not sent back with a new verdict form. They're just sent back, do you want to do anything different with the verdict that you have already reached with the participation of this juror who's racially biased? And their answer is no, and that is not enough. That de minimis instruction and deliberation is not enough to separate this case from those cases in which this Court has said it's structural error. That juror participated in deliberation up to the point that it leads to a verdict, and that's enough under the ambit of this Court's rule and rationale would be our argument. I'll leave it at that for now. Thank you. All right, thank you. We have a minute left. Good morning. May it please the Court. Darcy Crane for the United States. The United States is asking this Court to affirm the district court's denial of the motion for mistrial and new trial, as well as deny the defendant's request to remand for an evidentiary hearing. In this case, the procedural safeguards that were recognized in Pena-Rodriguez worked. In this case, a juror approached the Court prior to the verdict being rendered and informed Court staff that there was a concern about racism or racist comments that had been made in the jury room. At that time, the district court undertook a procedure to obtain additional information, a procedure that ultimately led to an in-camera hearing that required the questioning of every juror. These jurors, it was Friday afternoon, they wanted to go home. They reached the same verdict with Juror 5 as they gave after the in-camera review and the excusal of Juror 5. So why, I guess, I don't understand why there wouldn't be this presumption here that the racist comments of Juror 5 infected their deliberations. Your Honor, the government disagrees with the characterization that the jury reached the same verdict that was initially prepared to return prior to Juror 16 raising the issue in the court undertaking the procedure. The district court in this case took pains to make sure that the parties did not know where the jury stood at the time at which they would have returned that proposed verdict. And so there is no way to know if the verdict that the jury was prepared to return the morning of Friday versus... But what do we know about what they said during the juror in-camera interviews? They know that they had a verdict on some, but they also hung on one, and that is ultimately what they did, correct? I don't... Yes, that's the verdict that was ultimately returned, Your Honor. I don't know if there were specifics about how many there were hung on to that extent. But the district court did inquire of every juror whether they had heard any comment that would have implicated some bias to them with an emphasis on racial or ethnic bias. And that's part of the problem. I read the transcript, and in Peña-Rodriguez, the court talked about how difficult it is to determine racial bias for a variety of pragmatic reasons, and that general questions about bias aren't going to get... A lot of times the court asked, did you hear anything that you consider to be bias? Well, that's tough because someone who's biased might not consider a comment to be bias. There are times where it's unclear whether they didn't hear it or whether they didn't consider it to be bias. A lot of the questions were very high-level and vague, and that's part of the problem here is that I feel like we don't know. We don't know because the district court felt very restricted, and we don't know to what extent Juror 5 influenced deliberations, how. So I don't... Considering the historical, constitutional, and pragmatic considerations identified in Peña-Rodriguez, I don't know how we know that there wasn't prejudice here. We know, Your Honor, because the safeguards identified in Peña-Rodriguez to not get to that point worked in this case. A juror approached the court and identified the comments that he had heard, and then the court undertook to ask that Juror 16, was there any other jurors that that juror thought had overheard the same comment? The court began with two of those jurors. One of them did identify hearing a comment. There was a second juror, and potentially probably we'll say three jurors to be expansive, that told the court that they heard some sort of comment that could relate to racial or ethnic bias. Those were the three jurors plus Juror 16. The court, however, asked every juror if they had heard a comment, what that comment was, and whether or not it would affect their deliberations or verdict, and every juror unequivocally answered no. And reviewing the courts... Answered no, that they had not heard the comment, or no, that it would not affect their verdict? No, no, that it would not affect their verdict. Because three had heard the comment. Yes, Your Honor. Three had heard a comment. It's not necessarily the same, the exact same recitation. Another point of interest in this case is that when questioning the jurors, it became clear that a number of jurors had heard an accusation by Juror 16 that another juror was racist. And a number of jurors on the jury told the court about this, and they had interpreted that as being made towards Juror 1. In fact, Juror 1 self-reported to the court during the in-camera hearing that that juror had been accused of racism. When asked, Juror 1 told the court that the juror was reading the jury instructions from the court at the time that that comment was made. It appears from listening to all of the in-camera hearings, the court determined that the comment that Juror 16 made was wrongfully, a number of jurors wrongfully thought it was made toward Juror 1 when it was intended to be made. Let me ask you another question. I'm looking at the instruction that the district court gave. It's really vague. It doesn't say disregard any statements of Juror 5. It just says, and in reality, the thing you should consider is whether excusing Juror 5 and functioning as a jury of 11, whether you have reached a different verdict or would reach a different verdict, that's up to you to decide. That doesn't clearly say you have to disregard any statements that Juror 5 made during your previous five hours of deliberations. You would agree with that, right? Yes, Your Honor. So how is this instruction sufficient? This instruction, when paired with the questions and comments made by the district court during the in-camera hearings, is sufficient to ensure that the jury of 11 that returned a verdict did not include any members who were racially or ethnically biased. And what were those comments during the in-camera jury interviews? Are you referring just to the question of will you be impartial, or was there a specific instruction? The question and the interaction that the court undertook, Your Honor. Which was what? Boil it down to what's dispositive here. That the court first inquired, that the court first established whether or not the juror had heard a comment that they would consider to be biased. If that juror had heard the comment, what they heard, and when it was made, and then ultimately the court had dialogue with each of the jurors about whether or not if they had heard a comment, that comment would impact in any way their deliberation or their verdict. To which each juror answered no, it would not. You know, I wanted to talk to you about Sarkeesian because you rely on that so much in your brief. In that case, it's distinguishable because all of it happened before even closing arguments and before deliberations. Whereas here, we have a racist juror who participated for five hours, and the jury said we've reached a verdict with this racist juror. So how can you rely on Sarkeesian here? The government looks to Sarkeesian, Your Honor, because it is one of the few cases in which the juror bias issue was discovered prior to the verdict being accepted by the district court. Many of the other cases, Dyer v. Calderon, Pena-Rodriguez, all occurred that the error was discovered after the jury had returned their verdict. And so the government relies on Sarkeesian because it is a case in which the court found that the error or the potential bias— I agree. The fact that the—in Sarkeesian, they haven't even finished accepting all of the evidence that's going to be admitted during the trial. They haven't had closing arguments. They haven't had closing jury instructions. They haven't started deliberating. That's a significant difference, isn't it? It is, Your Honor, but the district court undertook the procedure that was somewhat loosely outlined in Dyer in this case, which was when an issue of colorable bias on the jury was raised, it undertook an inquiry, in this case an in-camera hearing, to determine what had been said when, by whom, and the impact that the jurors reported that that did or did not have on them. And after observing all of the jurors, the district court felt confident that none of the remaining 11 jurors who proceeded to verdict would be impacted by the comments that juror 5 had made. In this case, Your Honor, government relies on Sarkeesian because that is one of the few pre-verdict bias cases that has on their— Well, Sarkeesian also expressly reserved the question of whether Rummer applies and decided in the alternative that it was met, right? And then Sarkeesian also, the standard that you rely on, was actually adopted from a plain error review standard, which also doesn't apply here. Is that correct? Yes, Your Honor.  And Sarkeesian also involved expressed bias that had nothing to do with the defendant or a material witness in the case. Is that correct? Yes, Your Honor. So why should we say Sarkeesian is controlling, considering all those factors? Is it okay if I answer, Your Honor? Yeah. To look at the procedures that were undertaken by the court in Sarkeesian, that is why the government is asking this court to look at that case as analogous because while some of the facts are distinguishable, similarly, the district court in that case also tried to have the same type of procedures to take action against jury bias. And what do we do with the fact that Pena-Rodriguez said racial bias is different from other types of juror bias? What the government is asking to do, the court here doesn't run afoul of Pena-Rodriguez's sentiments. Okay, why not? Because in this case, the district court did take seriously this allegation of racial bias and inquired with all the jurors whether or not that had affected their verdict. And Pena-Rodriguez left open the question of how a district court might go about resolving the issue of racial juror bias. In its findings, in addition, Pena-Rodriguez did note that although racial bias is insidious and special consideration should be given to considering post-verdict, how that's investigated under Rule 606, it also did note that there were procedural safeguards in place. And in this case, those procedural safeguards worked, and so it wasn't necessary to reach the same level that Pena-Rodriguez did because that was a post-verdict case. Okay, I understand. Thank you. All right, any further questions from my colleagues? No? All right, thank you. Thank you. Thank you. Two points. I think this is Judge Chung's point, is that we don't know what exactly happened in those first five hours of deliberation in the role of Juror 5 and Juror 16, and we don't know exactly what happened in those approximately ten minutes of deliberation. And that's part of the problem, is that Rule 606 prevented the district court from fully disentangling that process. But practically speaking, what we can say is that that subsequent deliberation with 11 jurors relied on the work that was done in those first five hours. Five hours versus ten minutes, it's just common sense that that significant period of deliberation that involved the racist juror, they stood on the shoulders of that deliberation to reach the verdict that was returned in this case. Can I ask you, though, would that require us to assume the jurors did not follow the jury instructions because the preliminary jury instructions, the final jury instructions, specifically said you have to set aside, you know, likes, dislikes, prejudices, sympathies, you know, the standard Ninth Circuit model jury instructions. So we'd have to assume that that set of jurors disregarded that. And we're not allowed to do that, right? So aren't we required to presume that jurors follow the instructions? Well, two points. One, we know that one of the jurors didn't follow those instructions. That's Juror 5, and he participated in deliberations. And then second is that I think we can accept that many of these jurors thought that they were complying with those instructions, that they subjectively thought they were being impartial, but there's numerous instances where this court assesses the significance of the prejudicial information or outside influence and says that jurors are not very good at self-assessment. They might have blind spots or reasons why they're going to say when they're asked, yes, I'm being impartial, I'm considering the right thing, but when the outside influence is so odious that that oftentimes is what this court focuses on rather than those jurors' own self-assessment. And that's the case here, is that that influence is so significant for the length that it's there, for the odiousness of the comments, that these jurors' own assessment of that is just not the end of the answer. And what are you relying on for that, Dyer, or what are you relying on? We can't trust jurors' assessments of their own impartiality. What are you relying on for that? I would point to a few cases that we cite. Caldieri says that ultimately the question of, and maybe I'm mispronouncing my case, sorry. Caldiero says that ultimately the question of whether jury misconduct is prejudicial is a review de novo. Even though there's a factual component of it, it's a mixed question of law and fact. The fact is the jurors' subjective self-assessment, but the legal question is whether the influence is so prejudicial. But examples of cases where this court has said, don't trust the jury's self-assessment, that's not the entire answer. Caliendo, Jeffries, and Dyer are at least, and Hindley as well are four that are cited in Mr. Sanchez's briefs. Unless the court has any other questions, I'll submit. Let me just check. Thank you very much. Thank you to both counsel. These were extremely helpful arguments. Thank you.
judges: BEA, KOH, SUNG